· SABOLIK, Appellant,

v.

HGG CHESTNUT LAKE LIMITED PARTNERSHIP, d.b.a.
Chestnut Lake Apartments et al., Appellees.

[Cite as *Sabolik v. HGG Chestnut Lake Ltd. Partnership*,
180 Ohio App.3d 576, 2009-Ohio-130.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 91055.

Decided Jan. 15, 2009.

578

Richard C. Alkire Co., L.P.A., Richard C. Alkire, and Dean C. Nieding; and Dubyak & Goldense and Paul V. Wolf, for appellant.

Rawlin Gravens Co., L.P.A., Terrance P. Gravens, and Ryan N. Clark, for appellees HGG Chestnut Lake Limited Partnership, d.b.a. Chestnut Lake Apartments and I. & M.J. Gross Company.

Michael F. Farrell, for appellee Integrated Control Solutions, Inc.

MELODY J. STEWART, Judge.

{¶ 1} Plaintiff-appellant, Donald R. Sabolik, appeals from a summary judgment rendered on his negligence complaint in favor of defendants-appellees, HGG Chestnut Lake Limited Partnership ("Chestnut Lake") and Integrated Control Solutions, Inc. ("ICS"). Sabolik, a tenant in an apartment building owned by Chestnut Lake, suffered severe burns from scalding water that came out of his bathtub water tap. He alleged that Chestnut Lake negligently failed to regulate the temperature of water flowing into his bathroom and that ICS, which installed a computerized energy-savings system for Chestnut Lake, failed to activate software that would provide scald protection and further failed to activate a warning alarm to alert when water temperature exceeded programmed parameters. ICS sought summary judgment on grounds that it properly installed the energy-management control system and had no duty to regulate the water temperature. Chestnut Lake sought summary judgment on grounds that Sabolik offered no evidence to show that the water had been heated to an unsafe temperature or that Chestnut Lake had cause to be aware of spikes in the hot-water temperature. It also argued that Sabolik's burns were caused when he suffered a seizure and accidently increased the water temperature with his foot as he lay thrashing in the bathtub. The court granted summary judgment without opinion.

I

{¶ 2} Sabolik first argues that the court erred by granting summary judgment to Chestnut Lake because there were issues of material fact relating to Chestnut Lake's duty of care and whether the breach of that duty of care proximately caused his injuries. He maintains that Chestnut Lake had a duty to install a mixing valve on the hot-water heater to ensure that the water temperature did not rise above 120 degrees.

A

{¶ 3} Pursuant to Civ.R. 56(C), summary judgment may issue when, after viewing the evidence in a light most favorable to the nonmoving party, there is no genuine issue as to any material fact and reasonable minds could conclude only that judgment must issue as a matter of law.

{¶ 4} The underlying facts are largely uncontested. Sabolik rented an apartment in building No. 1 at Chestnut Lake. Building No. 1 had 121 units. The day before the incident, Sabolik fell out of bed and struck a night stand, injuring his shoulder. His doctor advised him to stand in the shower and run hot water over his shoulder. Late for work, he hurried through his shower and did not run hot water over his shoulder as instructed.

{¶ 5} When Sabolik returned from work, his shoulder continued to hurt, so he took another shower. He obtained no relief, however, and after a few seconds, decided to run a bath instead. Sabolik's bathroom contained a shower/bath combination, so he ran water from the tub's faucet and lay down in the tub to soak his shoulder.

{¶ 6} As he lay in the tub, Sabolik felt a seizure come on. Sabolik had a preexisting seizure disorder for which he took medication three times a day. He claimed that the seizures occurred "only every once in a while," but did not deny telling hospital staff that he suffered two to three seizures per month. The tub had separate hot and cold water knobs, and he used his foot to turn off the water. But instead of turning the hot water off, he inadvertently turned the hot water knob to its highest temperature. When he tried to exit the tub, he slipped and went back under the water. He eventually managed to use his foot to turn the water off and exited the tub. The hot water scalded the tops of Sabolik's feet, the front of his legs, and his left buttock, forcing him to seek medical treatment for severe burns. He estimated that he had been under the hot water for less than one minute and that he did not lose consciousness during the seizure.

{¶ 7} Sabolik conceded that in the four years he lived at Chestnut Lake, he had no problems with the temperature of the hot water. He said he was unaware of any other persons, including his roommate, who voiced complaints about the water temperature.

{¶ 8} Chestnut Lake checked the water temperature at the hot-water heater a few hours after the incident and confirmed that the hot-water heater had been set to the industry standard temperature of 120 degrees. A maintenance person who tested the temperature of the water coming from Sabolik's tub that same day found the temperature below 120 degrees.

**B**

{¶ 9} In *Menifee v. Ohio Welding Prods., Inc.* (1984), 15 Ohio St.3d 75, 77, 15 OBR 179, 472 N.E.2d 707, the Supreme Court stated:

{¶ 10} "[I]n order to establish actionable negligence, one must show the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom. * * * The existence of a duty depends on the foreseeability of the injury."

{¶ 11} At common law, a landlord generally had no duty to a tenant and was immune from tort liability arising from a dangerous condition on the leased premises, unless the landlord retained control of the premises. *Shump v. First Continental–Robinwood Assoc., Ltd.* (1994), 71 Ohio St.3d 414, 417, 644 N.E.2d 291, citing *Burdick v. Cheadle* (1875), 26 Ohio St. 393. In *Shroades v. Rental Homes, Inc.* (1981), 68 Ohio St.2d 20, 23, 22 O.O.3d 152, 427 N.E.2d 774, the supreme court noted that "breach of a duty imposed by statute has been one exception to the landlord's immunity from tort claims."

{¶ 12} A landlord's statutory duty is set forth in general in R.C. Chapter 5321, and in particular in R.C. 5321.04(A)(4), which imposes upon a landlord the duty to "[m]aintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, and air conditioning fixtures and appliances, and elevators, supplied or required to be supplied by him."

{¶ 13} Violations of R.C. 5321.04(A)(4) are considered negligence per se. *McKenzie v. FSF Beacon Hill Assoc., L.L.C.,* Franklin App. No. 05AP–1194, 2006-Ohio-6894, 2006 WL 3775857, ¶ 11; *Trammell v. McDonald,* Defiance App. No. 4–04–15, 2004-Ohio-4805, 2004 WL 2026414, ¶ 12. It is important to recognize that negligence per se is not strict liability, but the legislative establishment of a standard of care, the violation of which constitutes negligence. *Chambers v. St. Mary's School* (1998), 82 Ohio St.3d 563, 697 N.E.2d 198. The plaintiff continues to bear the burden of proving a breach of the statutory standard of care. *Morgan v. Mamone,* Cuyahoga App. No. 87612, 2006-Ohio-6944, 2006 WL 3804527, ¶ 19, citing *Shroades,* 68 Ohio St.2d 20, 22 O.O.3d 152, 427 N.E.2d 774. "[A] landlord will be excused from liability [for a statutory violation] if he neither knew nor should have known of the factual circumstances that caused the violation." *Sikora v. Wenzel* (2000), 88 Ohio St.3d 493, 727 N.E.2d 1277, syllabus. Moreover, "[n]egligence per se does not dispense with a plaintiff's obligation to prove that the breach of the duty was the proximate cause of the injury complained of, nor does it obviate a plaintiff's obligation to prove that the landlord received actual or constructive notice of the condition causing the statutory violation." *Allstate Ins. Co. v. Henry,* Butler App. No. CA2006–07–168, 2007-Ohio-2556, 2007 WL 1531494, ¶ 11.

## II

{¶ 14} Sabolik maintained that the severity of his burns in such a short period of exposure to hot water meant that the actual water temperature of the water coming from his faucet had to be far in excess of 120 degrees. Noting that actual water temperature from a hot-water heater can vary by as much as 30 degrees, he argues that Chestnut Lake failed to maintain the plumbing in good working order as required by R.C. 5321.04(A)(4) because it did not install a tempering mixing valve to the hot-water heaters to ensure that the water temperature remained within safe limits.

### A

{¶ 15} Chestnut Lake used two 80–gallon hot-water heaters/boilers in Sabolik's building. These hot-water heaters supplied two 350–gallon hot-water holding tanks. Circulating pumps moved the water from the holding tanks throughout the building in order to provide hot water on demand for the residents. Chestnut Lake set the hot-water-heater thermostats to 120 degrees, a setting that both parties agree is recognized as the industry standard.

{¶ 16} A Chestnut Lake employee who assisted with the installation and operation of the boilers said he was aware that the boilers contained the warning that "due to the nature of the typical gas water heater, the water temperature in certain situations may vary up to 30° F higher or lower at the point of use such as (bathtubs, showers, sink) etc." The employee said that he did not check the actual temperature of the hot water, either from the hot-water tank or from taps in the building.

{¶ 17} Sabolik's expert offered his opinion that the seriousness of Sabolik's burns showed that "the hot water exiting Mr. Sabolik [sic] bathtub's spigot was much greater than 120° F, the recognized industry standard." He also noted that the instruction manual for the hot-water boilers warned: "In addition to using the lowest possible temperature setting that satisfies your hot water needs, a means, such as a mixing valve, should be used at the hot water taps * * * or at the water heater." A tempering or mixing valve mixes cold water with the hot from the heater to keep the outgoing water temperature fixed to a set temperature. The expert concluded that Chestnut Lake could have prevented Sabolik's scalding by installing a tempering/mixing valve that would have kept the water at a temperature no higher than 120 degrees. He also faulted Chestnut Lake for not monitoring water temperature on a regular basis.

### B

{¶ 18} Neither of these alleged deficiencies raised a violation of the standard of care, because there is no evidence to show that Chestnut Lake had

prior notice of any defects to the hot-water system sufficient to establish negligence per se. Chestnut Lake had no prior complaints about the water temperature. Sabolik himself conceded that he not only had no previous problems with the temperature of the hot water, but that he did not know of any other tenants making that complaint.

{¶ 19} The hot-water heater warnings suggesting the installation of a tempering mixing valve do not rise to the level of prior notice that a defective condition existed. Apart from the incident involving Sabolik, there was no evidence of any kind to show that the water temperature had been an issue for any of the occupants of the 121 apartment units in Sabolik's building at any time. Even though there was a possibility that the water temperature could fluctuate, the lack of any complaints about that temperature allowed Chestnut Lake to assume that the water temperature remained constant and safe. Even Sabolik had to concede that up until the point when he accidently turned the hot water to maximum, he had no complaints about the temperature. This uncontradicted evidence gave Chestnut Lake no reason to believe that the plumbing was not in a safe condition and that the installation of a tempering mixing device was warranted.

## C

{¶ 20} Even had Sabolik demonstrated a breach of the statutory standard of care, we find that he did not show that this breach proximately caused his injury.

{¶ 21} "[T]he proximate cause of an event is that which in a natural and continuous sequence, unbroken by any new, independent cause, produces that event and without which that event would not have occurred." *Aiken v. Indus. Comm.* (1944), 143 Ohio St. 113, 117, 28 O.O. 50, 53 N.E.2d 1018. This definition encompasses a sense of "but for" in that an original, wrongful, or negligent act in a natural and continuous sequence produces a result that would not have taken place without the act. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 287, 21 O.O.3d 177, 423 N.E.2d 467. In other words, proximate cause is " 'that without which the accident would not have happened, and from which the injury or a like injury might have been anticipated.' " *Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 143, 539 N.E.2d 614, quoting *Corrigan v. E.W. Bohren Transport Co.* (C.A.6, 1968), 408 F.2d 301, 303.

{¶ 22} Viewing the evidence in a light most favorable to Sabolik, we find as a matter of law that he failed to establish that Chestnut Lake's failure to install a tempering mixing device and to monitor the temperature of the hot water proximately caused his injuries. By his own admission, Sabolik accidently turned the hot water to its highest setting when he tried to turn the hot water off

with his foot while having a seizure. This was not an unexplained scalding precipitated by some mechanical flaw in the plumbing system, but an event caused by Sabolik's actions. Because Sabolik caused the increase in the hot water, Chestnut Lake bore no responsibility for the injuries caused by his actions. It likewise had no obligation to anticipate that Sabolik would have a seizure that might cause him to mistakenly turn the hot water to its highest temperature. See *Gatewood v. Ohio Dept. of Rehab. & Corr.* (1989), 62 Ohio Misc.2d 682, 610 N.E.2d 648 (finding it unforeseeable that a prison inmate, subject to epileptic seizures, would have a seizure and suffer severe burns from hot water while taking a shower). Sabolik's injuries were not the proximate result of Chestnut Lake's actions, but the unfortunate result of his seizure-induced accident. The court did not err by granting summary judgment to Chestnut Lake.

### III

{¶ 23} Sabolik next argues that ICS was negligent in the performance of its contract with Chestnut Lake because it failed to program its system to prohibit a water temperature in excess of 120 degrees and failed to activate an alarm that would sound in the event that the water temperature exceeded 120 degrees.

### A

{¶ 24} ICS installed a passive water-temperature control system for Chestnut Lake. The system conserved energy by determining the demand for hot water and decreasing the hot-water temperature to 105 degrees at nonpeak usage times. An ICS representative said that the system was "passive" because it could not increase the water temperature above the thermostat setting. ICS did not set the "high set point" temperature for the hot-water heater.

### B

{¶ 25} Sabolik argued that the ICS system was capable of being programmed to limit the maximum temperature of the water to 120 degrees and sound an alarm in the event that the water temperature exceeded programmed limits. He maintains that ICS's failure to do so breached its duty of care under the circumstances.

{¶ 26} Even if we assume without deciding that ICS breached a duty of care to Sabolik, we conclude that Sabolik has failed to establish a triable issue of fact on the causation element of his negligence claim against ICS. A Chestnut Lake maintenance employee testified at deposition that although the ICS system had been "hooked up" at the time of the injury, the programmable elements of the system that controlled the water temperature during nonpeak usage hours

had been disconnected at the time of Sabolik's scalding. He explained that Chestnut Lake had a number of tenants who worked second and third shifts, creating an off-peak demand for hot water that made utilization of the ICS unit energy-savings features impractical. The employee testified that Chestnut Lake chose not to run that part of the program at all during the time he worked there, a period beginning well before and after the date on which Sabolik suffered his injuries.

{¶ 27} The uncontradicted evidence shows that the "passive" ICS system used by Chestnut Lake could not raise the water temperature beyond that set by the user. The employee agreed that "the only thing that controlled the temperature of the water was the setting on the thermostat on the water tank itself." In other words, once Chestnut Lake set the water temperature at 120 degrees, the ICS system could not heat the water beyond that temperature. ICS could not be liable to Sabolik for failing to program a 120–degree maximum temperature or set an alarm because it had no duty to set the temperature of the hot-water heater.

{¶ 28} Sabolik disputes this conclusion, arguing that Chestnut Lake only turned off the energy-saving part of the system—it did not bypass the temperature controls on the ICS system that allowed the hot-water heater to operate. While this argument is supported by the evidence, it is immaterial to the issue of ICS's negligence. The ICS unit could not operate to heat water beyond the 120–degree maximum temperature set by Chestnut Lake, so any upward spike in temperature could not have been proximately caused by the ICS system. If the water exceeded a temperature of 120 degrees, it did so without any fault by ICS.

C

{¶ 29} We also reject Sabolik's argument that ICS should have activated programming within the system that would sound an alarm if the hot-water temperature exceeded 120 degrees. An ICS representative insisted that "our concern was not making hot water, which we didn't control hot water, we controlled setback temperature. Our goal was to make cold water." In other words, Chestnut Lake hired ICS to implement a system that would allow the hot-water heaters to run at a lower temperature during nonpeak usage hours in order to save energy costs. Chestnut Lake did not hire ICS to monitor the maximum temperature of the hot water, so it would have been beyond the scope of the contract for ICS to activate an alarm to monitor temperature in excess of that set by the thermostat.

{¶ 30} Sabolik maintains, however, that ICS had knowledge of one other scalding incident involving a job that the ICS representative worked on approximately 13 years before Sabolik suffered his burns. He argues that this incident placed ICS on notice that scald burns were foreseeable, thus creating the

independent duty for ICS to program the system to sound an alarm when the water temperature exceeded 120 degrees.

{¶ 31} The ICS representative testified at deposition that some 13 years earlier, he was hired by a plumbing contractor at another site to move preexisting controls to a new boiler. The representative said that the plumbing contractor "told me that he was being sued because a baby was scalded by hot water in one of the apartments at that building where we did this boiler change out." The representative could not recall any of the circumstances other than that a child had been scalded. He had no knowledge of how the child had been burned or who had been at fault.

{¶ 32} In negligence law, the existence of a duty "depends on the foreseeability of the injury." *Menifee*, 15 Ohio St.3d at 77, 15 OBR 179, 472 N.E.2d 707. The test used to determine foreseeability is "whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." Id. The existence of a legal duty in ordinary negligence cases is generally a question of law for the court. *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265.

{¶ 33} The evidence that ICS knew of a prior scalding incident occurring some 13 years or so before Sabolik's burns occurred did not, as a matter of law, create a duty for ICS to program an alarm into its system. The ICS representative knew only that a child had been scalded and that the general plumbing contractor had been sued. There were no facts to show how the scalding occurred or who was at fault. Evidence in the record from both parties suggests that hot-water burns are a direct product of two factors: water temperature and length of exposure. Even if exposed to water that had been heated to no more than the industry standard of 120°, a person could be burned if the exposure time was long enough or if the person had sensitive skin—children and seniors are at particular risk in this regard.

{¶ 34} ICS knew of no evidence to show that this scalding had been caused by water that had been heated beyond 120°, nor was there evidence to show the child's length of exposure to the hot water. In short, there were no facts of any kind establishing the kind of fault that would have led a reasonably prudent person to conclude that an alarm system could have prevented similar incidents. As a matter of law, this prior incident 13 years earlier involving an unknown third party did not create a duty for ICS to program the alarm. The court did not err by granting summary judgment to ICS.

## IV

{¶ 35} In his third assignment of error, Sabolik complains that the court erred by refusing to grant him leave to file instanter surreply briefs in response to the separate motions for summary judgment filed by Chestnut Lake and ICS.

{¶ 36} There are no provisions in the Rules of Civil Procedure that allow for the filing of a surreply to a motion for summary judgment. *Perlmutter v. People's Jewelry Co.*, Lucas App. No. L–04–1271, 2005-Ohio-5031, 2005 WL 2334704, at ¶ 4, fn. 1. Loc.R. 11(D) of the Cuyahoga County Court of Common Pleas states that "[r]eply or additional briefs upon motions and submissions may be filed with leave of the Court only upon a showing of good cause." Consequently, the court has discretion when deciding whether to allow leave to file a surreply. *Morris–Walden v. Moore*, Cuyahoga App. No. 87989, 2007-Ohio-262, 2007 WL 178450, at ¶ 27.

{¶ 37} We have reviewed Sabolik's motions for leave to file a surreply and conclude that the court did not abuse its discretion by denying leave because the offered motions did not state sufficient cause. Sabolik offered the surreplies to address new arguments and "misrepresentations of fact" contained in the reply briefs filed by both Chestnut Lake and ICS. These were not sufficiently compelling reasons to require the court to exercise its discretion and allow additional briefing. The briefs filed by the parties very thoroughly addressed the issues, so the court could rationally conclude that it needed no additional information. Moreover, given the de novo nature of our review on summary judgment, we have independently reviewed the record on appeal and are satisfied that none of Sabolik's arguments offered in surreply were outcome determinative.

Judgment affirmed.

COONEY, A.J., and GALLAGHER, J., concur.