[Cite as *Rivera v. Crosby*, 194 Ohio App.3d 147, 2011-Ohio-2265.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 95229**

## RIVERA,

APPELLEE,

v.

## CROSBY ET AL.,

APPELLANTS.

## JUDGMENT:
REVERSED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-644982

**BEFORE:** Sweeney, J., Kilbane, A.J., and Rocco, J.

**RELEASED AND JOURNALIZED:** May 12, 2011

Jonathan E. Rosenbaum, for appellee.

Lester S. Potash, for appellants.

JAMES J. SWEENEY, Judge.

{¶ 1}   Appellant William M. Crosby appeals the trial court's overruling of his motion for summary judgment in favor of appellee, Jose Rivera, and the subsequent judgment against him for legal malpractice.   For the reasons set forth herein, we reverse the judgment of the trial court.

{¶ 2}   In 2002, Rivera hired two lawyers, each to assist with a separate and distinct legal matter.   Rivera first retained Crosby, a personal-injury lawyer, to pursue a claim for sexual abuse against the Catholic Diocese of Cleveland. Thereafter, Rivera retained attorney James Kerner to prepare and file a voluntary petition for relief under Chapter 7 of the Bankruptcy Code and to represent Rivera throughout those proceedings.

{¶ 3}   As required when preparing the bankruptcy petition, Kerner inquired of Rivera about his financial affairs.   This inquiry not only included all of Rivera's debts and possible claims against him but all his assets, including Rivera's pending personal-injury suit.   Kerner made clear to Rivera that he was required to disclose any claim pending in court, and if he recovered any funds arising from such a claim, federal bankruptcy law required him to report and pay over the proceeds to the trustee appointed by the bankruptcy court.   Kerner verified that he advised Rivera of these obligations, and Rivera confirmed having been so cautioned.

{¶ 4}   The bankruptcy court appointed Marvin Sicherman ("trustee") as the trustee administering Rivera's bankruptcy estate.  His responsibilities included the gathering of Rivera's assets for distribution to Rivera's creditors.

{¶ 5}   On March 10, 2003, the trustee conducted the meeting of creditors.[1] Rivera testified that he understood that his personal-injury suit was property of his bankruptcy estate. Rivera received his bankruptcy discharge on April 28, 2003.   Postpetition, on June 19, 2003, Rivera's personal-injury suit was settled for $175,000.   Rivera immediately notified Kerner of the settlement and asked Kerner to inform the trustee.  On July 11, 2003, less than one month after the settlement of the personal-injury suit, the trustee wrote to Crosby, reiterating that the personal-injury suit was the property of Rivera's bankruptcy estate.   On July 22, 2003, the trustee received a facsimile from Kerner advising that Rivera's personal-injury suit had "apparently been settled for $175,000." At that time, Kerner reiterated to Rivera that he was required to turn over all funds received from the settlement to the trustee.   Kerner informed Rivera that failure to report and turn over the proceeds could result in revocation of Rivera's bankruptcy discharge.

{¶ 6}   On February 14, 2004, the trustee demanded that Crosby provide an accounting of any settlement monies received by Rivera.   On February 23, 2004, Crosby replied to the trustee and stated that the settlement was confidential and Crosby would

---

[1] Section 341, Title 11, U. S. Code, requires an examination of the debtor under oath, commonly referred to as a "341 Meeting."

seek permission from Rivera to disclose the settlement terms.  At that time, Crosby had already distributed $15,000 of the settlement funds to Rivera.

{¶ 7}  On March 2, 2004, Crosby first informed the trustee that Rivera had been paid $15,000 from the settlement.  Thereafter, on March 23, 2004, Crosby e-mailed to Rivera a draft letter addressed to the trustee to be signed by Rivera.  That letter restated that Rivera had received a $15,000 settlement distribution.  Subsequently, on May 12, 2004, Rivera received an email from Crosby that read:

{¶ 8}  "I guess I'm trying to figure out how it happened that a couple of months ago, I had to tell the trustee how much you received and you had to separately inform him?  We helped craft that response, remember?  All I want to determine is if we can reasonably be assured that the inquiries are at an end and I can safely pay you over the balance which I've held in escrow, and not subsequently be stuck with a huge bill. Do you see?"

{¶ 9}  On June 8, 2004, Rivera was paid an additional $80,000 settlement distribution from Crosby's trust account.  The trustee was not advised of this second distribution.

{¶ 10} On August 12, 2004, the trustee filed a motion for turnover of funds, seeking turnover of the $15,000 settlement distribution of which he was aware. Thereafter, the following e-mails were exchanged between Rivera and Crosby:

{¶ 11} August 16, 2004—from Rivera to Crosby:  "It is very IMPORTANT that you call me ASAP!"

{¶ 12} August 17, 2004—Rivera to Crosby: "Attorney James Kerner call [sic] me and I asked him to dispute the issue. He said that you were wrong. That the diocese claim was an asset and that I was not entitle [sic] to any of the money and that you should have turned it over to the trustee. I told him I would call you and call him back. I'm getting a little scared here."

{¶ 13} August 18, 2004—Crosby to Rivera: "Don't be afraid, Kerner is an idiot. When I get back from vacation we will meet. Ask Kerner for your file."

{¶ 14} September 2, 2004—from Rivera to Crosby: "I received a letter from the Trustee and Attorney Kerner. I feel we should meet as soon as possible. I don't want to meet these guys and not be able to address them properly. I need to reply ASAP, this is not going to go away. The trustee seems to be pressuring Mr. Kerner * * *."

{¶ 15} September 8, 2004—from Rivera to Crosby: "I realize you know best, but I don't know how long these guys are going to wait. Please let me know when we can get together."

{¶ 16} The trustee's motion for turnover was heard by the bankruptcy court on September 7, 2004. An order granting the motion was entered on September 15, 2004.

{¶ 17} On October 15, 2004, counsel for the trustee wrote to Crosby acknowledging that the trustee had received the $15,000. An accounting of any additional settlement distributions was again requested. The trustee received no response from Crosby and subsequently sought records through a subpoena and an order pursuant to a Fed.R.Bankr.P. 2004 examination. Crosby again failed to respond.

**{¶ 18}** Rivera then obtained a substitute bankruptcy attorney, Jonathan E. Rosenbaum. On January 6, 2005, Rosenbaum wrote to the trustee and asserted that Rivera had "relied on Mr. Crosby's advice regarding the settlement proceeds and felt that since Mr. Crosby sent him the balance of settlement ($80,000) that it was proper to spend the money."

**{¶ 19}** During an October 10, 2005 deposition, Rivera testified, "Kerner said that I needed to turn the money in. And then Crosby said I don't need to." Believing that Crosby had reached a compromise with the trustee, Rivera spent the $80,000 balance of the settlement.

**{¶ 20}** On May 9, 2005, the trustee filed an adversary proceeding seeking an order revoking Rivera's discharge under Section 727 (d)(1), (d)(2), or (d)(3), Title 11, U.S.Code, and denying Rivera's discharge under Section 727(a)(6)(A) or (a)(2)(B), Title 11, U.S.Code. The trustee alleged that Rivera's discharge should be revoked and denied because (1) Rivera obtained his discharge through fraud by representing that he received only $15,000 in settlement of his personal-injury suit, and (2) Rivera fraudulently failed to surrender the second payment of $80,000 even though he knew the money was the property of the bankruptcy estate. At that time, Rivera filed a cross-claim against Crosby for legal malpractice and fraud. However, that claim was dismissed by the bankruptcy court for lack of subject-matter jurisdiction.

**{¶ 21}** Rivera filed a motion for summary judgment. He asserted that his discharge should not be revoked because the trustee was advised of the total settlement amount by

Kerner. Rivera also asserted that he relied upon the advice of Crosby in good faith. The trustee filed a cross-motion for summary judgment. The trustee submitted (1) his affidavit chronologically summarizing the events, (2) a transcript of the meeting of creditors, (3) Rivera's deposition, and (4) the series of e-mails between Rivera and Crosby.

{¶ 22} Following a hearing on the cross-motions for summary judgment, the bankruptcy court denied Rivera's motion and granted the trustee's motion, in part. Determining that there were no genuine issues of material fact, the court held that Rivera knowingly and fraudulently failed to deliver property of the bankruptcy estate to the trustee. The court, therefore, revoked and denied Rivera's discharge. Section 727(d)(2) and (a)(2)(B), Title 11, U.S.Code.

{¶ 23} On appeal, the bankruptcy appellate panel concluded that Rivera knew and understood his obligation to report and turn over the settlement proceeds to the trustee and that his reliance on Crosby's advice was unreasonable. Accordingly, the bankruptcy appellate panel affirmed the bankruptcy court's order granting summary judgment in favor of the trustee and revoking Rivera's discharge.

{¶ 24} Thereafter, Rivera brought suit against Crosby in the common pleas court, asserting three claims: count 1, legal malpractice; count 2, fraud, conversion, and embezzlement; and count 3, liability under R.C. 2913.02(A)(3) and 2307.61. After filing his answer, Crosby moved to dismiss the second and third causes of action for lack of

standing. The trial court reviewed Crosby's motion to dismiss as a motion for judgment on the pleadings and granted his motion on both counts 2 and 3.

{¶ 25} Crosby moved for summary judgment on the first cause of action, arguing that collateral estoppel and res judicata bar Rivera from asserting a legal-malpractice claim. In rejecting this argument, the trial court stated, "[T]his argument fails because the bankruptcy court clearly dismissed that claim for lack of subject matter jurisdiction and never discussed the merits of the claim."

{¶ 26} Further, the court found that Rivera had produced sufficient evidence to demonstrate that a material issue of fact existed in regard to the proximate cause element of the legal-malpractice claim. Accordingly, the trial court overruled Crosby's motion for summary judgment as to count 1, and the matter proceeded to trial.

{¶ 27} At trial, Rivera presented the expert testimony of David Simon, Esquire. Simon testified that based on his legal expertise, it was his opinion that Crosby fell well below the acceptable standard of care in the industry and proximately caused the revocation of Rivera's discharge and subsequent damages. In two separate rulings, the trial court first found Crosby negligent in his representation of Rivera and thereafter determined that as a proximate cause of such negligent representation, Rivera sustained damages of $266,540.61, for which the trial court rendered judgment to Rivera against Crosby.

{¶ 28} Crosby raises three assignments of error for review.[2]

---

[2] Appellant's assignments of error are contained in the appendix.

## Law and Analysis

### Manifest Weight of the Evidence

{¶ 29} In his third assignment of error, Crosby argues that the judgment in this case is against the manifest weight of the evidence. He contends that the evidence failed to establish that Rivera reasonably relied on his legal advice and that he was the proximate cause of Rivera's damages.

{¶ 30} It is well established that when some competent, credible evidence exists to support the judgment rendered by the trial court, an appellate court may not overturn that decision unless it is against the manifest weight of the evidence. *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. The knowledge a trial court gains through observing the witnesses and the parties in any proceeding (i.e., observing their demeanor, gestures, and voice inflections and using these observations in weighing the credibility of the proffered testimony) cannot be conveyed to a reviewing court by a printed record. *In re Satterwhite* (Aug. 23, 2001), Cuyahoga App. No. 77071, citing *Trickey v. Trickey* (1952), 158 Ohio St. 9, 13, 106 N.E.2d 772. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. *Seasons Coal Co.* As the Ohio Supreme Court has stated, "it is for the trial court to resolve disputes of fact and weigh the testimony and credibility of the witnesses." *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 550 N.E.2d 178.

**{¶ 31}** The following elements are necessary to establish a cause of action for legal malpractice: "(1) an attorney-client relationship, (2) professional duty arising from that relationship, (3) breach of that duty, (4) proximate cause, (5) and damages." *Shoemaker v. Gindlesberger*, 118 Ohio St.3d 226, 2008-Ohio-2012, 887 N.E.2d 1167, ¶ 8, citing *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 427, 674 N.E.2d 1164; *Krahn v. Kinney* (1989), 43 Ohio St.3d 103, 105, 538 N.E.2d 1058. The elements of a legal-malpractice claim are stated in the conjunctive, and the failure to establish an element of the claim is fatal. See *Williams-Roseman v. Owen* (Sept. 21, 2000), Franklin App. No. 99AP-871.

**{¶ 32}** Careful review of the record indicates that there is ample evidence to support Rivera's position that Crosby, in fact, offered bankruptcy advice in this matter. Specifically, Crosby advised Rivera that he believed Rivera may have been eligible for certain exemptions under bankruptcy law based on the nature of his personal-injury suit. Crosby owed a duty to Rivera to render advice consistent with the standard of care required by law. While we recognize that Rivera has presented expert testimony that Crosby's legal advice fell below the appropriate standard of care, we find that Rivera has failed to present competent and credible evidence that Crosby was the proximate cause of his damages.

**{¶ 33}** In *DeMeo v. Provident Bank*, Cuyahoga App. No. 89442, 2008-Ohio-2936, at ¶ 62, this court stated, "When the attorney performs his duty, the client cannot later claim foul unless the client's harm or injury is proximately caused by the lawyer's conduct."

{¶ 34} " '[T]he proximate cause of an event is that which in a natural and continuous sequence, unbroken by any new, independent cause, produces that event and without which that event would not have occurred.' *Aiken v. Indus. Comm.* (1944), 143 Ohio St. 113, 117. This definition encompasses a sense of 'but for' in that an original, wrongful, or negligent act in a natural and continuous sequence produces a result that would not have taken place without the act. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 287. In other words, proximate cause is ' "that without which the accident would not have happened, and from which the injury or a like injury might have been anticipated." ' *Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 143, quoting *Corrigan v. E.W. Bohren Transport Co.* (C.A.6, 1968), 408 F.2d 301, 303." *Sabolik v. HGG Chestnut Lake Ltd. Partnership*, 180 Ohio App.3d 576, 2009-Ohio-130, 906 N.E.2d 488, ¶ 21.

{¶ 35} From the beginning of his bankruptcy case, Rivera acknowledged that his personal-injury suit belonged to the bankruptcy estate. He listed the pending litigation on his schedules. He was instructed on numerous occasions by Kerner, his bankruptcy attorney, that he was required to turn all proceeds over to the trustee. At trial, Kerner was asked about Rivera's understanding of his obligations regarding his bankruptcy proceeding and the settlement proceeds from his personal-injury suit:

{¶ 36} "Q. So at best, Mr. Rivera knew the following: One, he had an obligation to tell you and the bankruptcy trustee that he settled the case?

{¶ 37} "A. Yes.

{¶ 38} "Q. Two, that he had an obligation to tell you and to turn over to the bankruptcy trustee the proceeds of the settlement of that case?

{¶ 39} "A. Yes."

{¶ 40} Further, Rivera testified that the trustee specifically instructed him that he was required to turn over all claims and that he understood that the claim belonged to the bankruptcy estate. Specifically, the following dialogue took place:

{¶ 41} "Q. To the best of your understanding, was the $80,000 you received from the settlement with the Catholic Diocese?

{¶ 42} "A. Yes.

{¶ 43} "Q. Now you remember back when you had the 341 hearing that [the trustee] told you that if you receive any money you are to report it and pay it over to him? You remember him telling you that, right?

{¶ 44} "A. Yes."

{¶ 45} In the face of losing his discharge and after spending the $80,000 settlement proceeds, Rivera now argues that he relied on the advice of Crosby, his personal-injury attorney, that he could spend the settlement proceeds. However, Rivera's alleged reliance on Crosby's advice was unreasonable. Without reliance to establish proximate cause, Rivera's claims for negligence and malpractice cannot be established. *McCleery v. Leach*, Lake App. No. 2001-L-195, 2003-Ohio-1875, at ¶ 57.

{¶ 46} As stated in *In re Rivera* (6th Cir.BAP, 2007), 356 B.R. 786:

{¶ 47} "[Rivera] obtained separate counsel to represent him in his bankruptcy case. His claimed reliance on the personal-injury counsel, rather than the advice of bankruptcy counsel, was neither reasonable nor in good faith. This is shown by [Rivera's] deposition testimony that he would rely on Kerner for advice in his bankruptcy case, and Crosby in his personal-injury litigation. * * * His convenient later explanation that he relied on Crosby's advice, rather than Kerner's, demonstrates a reckless indifference to the truth. This is tantamount to fraud. * * * His reliance upon the advice of Crosby was also unreasonable given the bankruptcy court's order on September 15, 2004 for turnover of the $15,000. This court order, together with Kerner's advice to turn over the full settlement and [Rivera's] acknowledgment at the meeting of creditors of his obligation to turnover the money, permits only one *reasonable* inference: [Rivera] knew he was obligated to turn over the full settlement. His 'whole pattern of conduct' supports a finding of fraudulent intent. * * * Because of [Rivera's] own testimony that [Kerner] advised him to turn over the full settlement to the Trustee, his denial of knowledge (based on Crosby's advice) that he needed to turn over the $80,000 is utterly implausible." (Emphasis sic.)

{¶ 48} We agree with the findings of the United States Bankruptcy Appellate Panel. The record clearly indicates that Rivera understood that he was required to turn over all proceeds from his settlement and failed to do so. Any assertion made by Crosby that the legal advice provided by Kerner was insufficient or incorrect played no direct or proximate role in Rivera's discharge. Rivera hired Kerner to represent him in his

bankruptcy proceeding and was warned that his bankruptcy would be discharged if he failed to turn over all proceeds to the trustee. Rivera simply ignored the advice of Kerner.

{¶ 49} Accordingly, we find that the weight of the evidence presented at trial does not support a finding that Crosby was the proximate cause of Rivera's damages. Because evidence presented at trial by Rivera does not support a finding of proximate cause, we hold that the trial court's judgment against Crosby for legal malpractice was against the manifest weight of the evidence. The trial court's judgment against Crosby for legal malpractice is reversed.

{¶ 50} Appellant's remaining assignments of error are rendered moot by our analysis above. App.R. 12(A)(1)(c).

{¶ 51} The judgment is reversed, and the cause is remanded to the lower court for further proceedings consistent with this opinion.

Judgment reversed

and cause remanded.

KILBANE, A.J., and ROCCO, J., concur.

---

APPENDIX

Appellant's assignments of error:

**{¶ 52}** I.      "The trial court erred when overruling Crosby's motion for summary judgment."

**{¶ 53}** II.     "The trial court erred when allowing expert witness testimony upon the issue of liability."

**{¶ 54}** III.    "The trial court's verdict is unsupported by the manifest weight of the evidence and is contrary to law."